653 S.E.2d 632

Susan M. JACKSON, Administratrix of
the Estate of Timothy J. Jackson,
Plaintiff Below, Appellant

v.

The PUTNAM COUNTY BOARD
OF EDUCATION, Defendant
Below, Appellee.

No. 33038.

Supreme Court of Appeals of
West Virginia.

Submitted Sept. 20, 2006.

Decided May 24, 2007.

Dissenting Opinion of Justice
Starcher June ·27, 2007.

Concurring Opinion of Chief Justice
Davis June 29, 2007.

Bernard E. Layne, III, Greg R. Lord, Sharon McKeny Lord, Lord, Lord & Layne Charleston, for the Appellant.

Stephen M. Fowler, Julie M. Meeks, Travis A. Griffith, Pullin, Fowler & Flanagan, Charleston, for the Appellee.

PER CURIAM:

This action is before this Court upon the appeal of Susan M. Jackson, Administratrix of the Estate of her son, Timothy J. Jackson, from the June 29, 2005, order of the Circuit Court of Putnam County, West Virginia, granting summary judgment in favor of the Putnam County Board of Education. Timothy, a student at Winfield High School, died as the result of a single-vehicle accident on Interstate 77. The driver of the vehicle, Brian C. Ramsburg, was a classmate, and he and Timothy were returning home from a weekend retreat for the school choir held at a campground in Kanawha County. Appellant Jackson alleged in the complaint that the Putnam County Board of Education had a duty to provide transportation to the students attending the retreat and that the Board's breach of that duty resulted in the death of her son. In granting summary judgment in favor of the Board, however, the Circuit Court found no such duty and, moreover, determined that, even if such a duty existed, the failure to provide transportation to the retreat was not, as a matter of law, a proximate cause of Timothy's death.

This Court has before it the petition for appeal, all matters of record which were before the Circuit Court and the briefs and argument of counsel Upon the applicable standards of review and for the reasons stated below, this Court is of the opinion that the Circuit Court was correct in granting summary judgment in favor of the Board. Accordingly, the order of the Circuit Court of Putnam County entered on June 29, 2005, is affirmed.

I.

Factual Background

During the 2001–02 school year, a class was offered at Winfield High School, through auditions, known as the General Admission Show Choir. Although some students participated in the Choir as an extracurricular activity, many students, such as Timothy J. Jackson, were enrolled in the Choir for school credit. The record indicates that the Show Choir had in excess of 40 student members. The objectives of the Choir included the teaching of music and dance to the students and the preparation of the Choir for competitions and ceremonial performances. To achieve those objectives, various mandatory rehearsals and retreats, in addition to classroom instruction, were scheduled by the Choir's Director, Jeffrey A. Haught, a teacher at Winfield High School.

At the beginning of the 2001–02 year, Haught distributed a flyer entitled "GA Retreat '01 Info," notifying students and parents that a retreat would be conducted at Rippling Waters Campgrounds near Sissonville, West Virginia, during the weekend of September 28–30. Rippling Waters is approximately 40 miles from Winfield High School by way of Charleston, West Virginia, and Interstate 77. Transportation by school or chartered bus was not planned for the retreat, and the flyer indicated that Haught was to receive notice, in advance, concerning the travel arrangements of each student. In the latter regard, the flyer stated: "Parents are discouraged from allowing students to drive other students without parental accom-

paniment. Please refer to the Handbook for such guidelines."

The Handbook, prepared by Director Haught, exclusively concerned the Choir and was entitled "General Admission Handbook of Policies and Procedures." It contained a number of rules and guidelines for individual travel, as well as travel by bus, to Show Choir events. The portions of the Handbook relevant to this action provided:

From time to time, GA members will travel individually to an event. This ·usually occurs when the distance is small enough to allow day trips, when GA is performing in the immediate area, or when the cost of renting a bus is prohibitive.

Members will present to the Director IN WRITING PRIOR TO THE TRIP how they will arrive at the event, who will be driving and who will be riding with them. (This is done to insure that every member's travel arrangements are accounted for, and so that the Director and parents are aware of who their child is riding with).

In these instances, General Admission's, and the Director's liability, is limited to the period from the member's arrival at the event site until dismissal from the event. All other liability for the child's safety lies with the parent, or their designated drivers.

Parents are STRONGLY discouraged from allowing students to drive to events unaccompanied by parents.

As stated above, members are to remain on site until dismissed from the event.

Again, the child's safety is of utmost importance, and parents should exercise their

wisdom, good judgment and discretion when planning travel arrangements.

(emphasis in the original) [1]

On September 28, 2001, Larry J. Jackson, Timothy's father, signed a Permission Statement indicating that he read and understood the General Admission Handbook and would abide by its guidelines and rules, as well as the relevant policies and regulations of Winfield High School, the Putnam County Board of Education and the State of West Virginia. Also on September 28, Mr. Jackson completed and signed a Health and Insurance Information form which described such matters as Timothy's allergies and current medications and which purported to release Director Haught, Winfield High School, the Putnam County Board of Education and others from claims arising from his son's "rehearsing, performing, or traveling with" the General Admission Show Choir.[2] Both the Permission Statement and the Health and Insurance Information form were sent to parents of Choir members at the beginning of the school year. Although not signed by Mr. Jackson until September 28, those documents did not specifically refer to the upcoming retreat.

The record demonstrates, however, that, prior to the September 28–30 weekend, Haught received a note from Timothy stating that his father, Larry J. Jackson, would drive him to the Rippling Waters Campgrounds. Timothy had ridden to and from previous Choir retreats and other events with Mr. Jackson.

Nevertheless, during his deposition, Larry J. Jackson testified that he and Timothy had reached a joint decision that Timothy would travel to the retreat with classmate Brian C.

---

1. The above admonition in the Handbook against allowing students to drive was also suggested in the Handbook's guidelines and rules pertaining to travel by bus, where students, in rare instances, were permitted to ride home with a parent after an event. In that situation, written notice was to be received by the Director in advance, and at the end of the event the parent and the member were required to "approach the Director IN PERSON to be dismissed" (emphasis in the original)

2. The Health and Insurance Information form stated in part:

I hereby release and agree to indemnify Mr. Jeffrey A. Haught, teacher; Winfield High School and its employees; the Putnam County Board of Education and its employees; and all adult chaperones from any and all claims or responsibilities of my child while rehearsing, performing, or traveling with the Winfield High School Show Choir, General Admission. In the event of a medical emergency, I authorize Mr. Jeff Haught or the other chaperones to give permission for medical treatment.

Ramsburg, and Mr. Jackson saw them leave from Timothy's home in Ramsburg's pick-up truck. This change in travel arrangements was never communicated to Director Haught or to any other school official. Approximately 40 students attended the retreat which concluded at 6:00 p.m., Sunday, September 30, 2001. Unknown to Haught, Timothy left Rippling Waters Campgrounds with Ramsburg.[3] On the return to Putnam County, Ramsburg, driving at an excessive rate of speed on Interstate 77, lost control of the pick-up truck causing it to turn over on the highway. Timothy, who was not wearing a seatbelt, died as a result of the accident.

## II.

### Procedural Background

On September 26, 2003, appellant Jackson filed a wrongful death action in the Circuit Court of Putnam County against the appellee, the Putnam County Board of Education. The complaint, sounding in negligence, alleged, *inter alia*, that the Board had a duty to provide transportation to the students attending the weekend retreat and that the Board's breach of that duty resulted in the death of her son, Timothy J. Jackson.[4]

Thereafter, on August 10, 2004, the Board filed a motion for summary judgment. The Board asserted that it had no duty to provide transportation to the September 2001 retreat and that, even if such a duty existed, the breach thereof was not a proximate cause of the accident. Attached to the motion were the following: (1) a memorandum in support of summary judgment, (2) the General Admission Handbook of Policies and Procedures, (3) the depositions of Larry J. Jackson, Brian C. Ramsburg and Jeffrey A. Haught, (4) the Permission Statement and the Health and Insurance Information form and (5) two accident reports prepared by the police. A memorandum in opposition to the

motion, without attachments, was filed by appellant Jackson, and a short reply thereto was filed by the Board.

Following argument of counsel, the Circuit Court entered the order of June 29, 2005, granting summary judgment in favor of the Putnam County Board of Education. The Circuit Court found no duty on the part of the Board to provide transportation to the retreat and that, even if such duty existed, the failure to provide transportation was not, as a matter of law, a proximate cause of Timothy's death. As the order stated in part:

> [T]he record indicates that Larry Jackson had agreed to transport Timothy J. Jackson to and from the Show Choir Retreat. However, unknown to the school officials, Larry Jackson passed the responsibility to transport Timothy J. Jackson to Brian Ramsburg. * * * Larry Jackson, the decedent's father, was negligent in knowingly directing Timothy J. Jackson to ride with a fellow student to and from the General Admission Show Choir retreat despite full knowledge of the purported rules and regulations set forth by the Show Choir. * * * Brian Ramsburg's negligent operation of his vehicle is a subsequent superseding / intervening act which also breaks the chain of causation not only with Larry Jackson's negligence, but also to that of the Board (if it would be determined that a legal duty was imposed by statute or by the Board's own rules and regulations).

Appellant Jackson's appeal to this Court was granted in March 2006.

## III.

### Standards of Review Concerning Summary Judgment

▮ Pursuant to Rule 56 of the West Virginia Rules of Civil Procedure, summary

---

**3.** During his deposition, Director Haught testified as follows;

Q. Okay. Did Timothy Jackson ever tell you that his plans had changed and he was going to ride with Ramsburg?
A. No. I am not aware that that is how he arrived.
* * *
Q. Did you see Tim leave with Mr. Ramsburg?

A. No.
Q. Did you know he was going to leave with Ramsburg?
A. No. Emphatically, no.

**4.** Prior to the filing of the complaint, Susan M. Jackson and Larry J. Jackson reached a settlement with the insurance carrier of the Ramsburg family and with their own insurance carriers with regard to the accident.

judgment is proper where the record demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Mueller v. American Electric Power Energy Services,* 214 W.Va. 390, 392–93, 589 S.E.2d 532, 534–35 (2003); 11A M.J., *Judgments and Decrees,* § 217.1 (Michie 1997). As this Court explained in syllabus point 7 of *Petros v. Kellas,* 146 W.Va. 619, 122 S.E.2d 177 (1961):

> The summary judgment procedure provided by Rule 56 of the West Virginia Rules of Civil Procedure does not infringe the constitutional right of a party to a trial by jury; it is not a substitute for a trial or a trial either by a jury or by the court of an issue of fact, but is a determination that, as a matter of law, there is no issue of fact to be tried.

Syl. pt. 3, *Harrison v. Town of Eleanor,* 191 W.Va. 611, 447 S.E.2d 546 (1994).

Specifically, syllabus point 3 of *Aetna Casualty and Surety Company v. Federal Insurance Company of New York,* 148 W.Va. 160, 133 S.E.2d 770 (1963), holds: "A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syl. pt. 2, *Stewart v. George,* 216 W.Va. 288, 607 S.E.2d 394 (2004); syl. pt. 1, *Mueller, supra;* syl. pt. 2, *Cantrell v. Cantrell,* 213 W.Va. 372, 582 S.E.2d 819 (2003); syl. pt. 2, *Conley v. Johnson,* 213 W.Va. 251, 580 S.E.2d 865 (2003).

Upon appeal, the entry of a summary judgment is reviewed by this Court *de novo. Redden v. Comer,* 200 W.Va. 209, 211, 488 S.E.2d 484, 486 (1997); syl. pt. 1, *Koffler v. City of Huntington,* 196 W.Va. 202, 469 S.E.2d 645 (1996); syl. pt. 1, *Painter v. Peavy,* 192 W.Va. 189, 451 S.E.2d 755 (1994). Nevertheless, as this Court stated in syllabus point 3 of *Fayette County National Bank v. Lilly,* 199 W.Va. 349, 484 S.E.2d 232 (1997): "Although our standard of review for summary judgment remains *de novo,* a circuit court's order granting summary judgment must set out factual findings sufficient to

permit meaningful appellate review. Findings of fact, by necessity, include those facts which the circuit court finds relevant, determinative of the issues and undisputed." *Syl., Hively v. Merrifield,* 212 W.Va. 804, 575 S.E.2d 414 (2002); syl. pt. 3, *Glover v. St. Mary's Hospital,* 209 W.Va. 695, 551 S.E.2d 31 (2001); syl. pt. 2, *State ex rel. Department of Health and Human Resources v. Kaufman,* 203 W.Va. 56, 506 S.E.2d 93 (1998).

## IV.

### Discussion

The determination of whether the appellee, the Putnam County Board of Education, had a duty to provide transportation to the students attending the September 2001 retreat at the Rippling Waters Campgrounds is a legal matter to be resolved by adjudication, rather than a factual question. As syllabus point 5 of *Aikens v. Debow,* 208 W.Va. 486, 541 S.E.2d 576 (2000), confirms: "The determination of whether a defendant in a particular case owes a duty to the plaintiff is not a factual question for the jury; rather the determination of whether a plaintiff is owed a duty of care by a defendant must be rendered by the court as a matter of law." *Clark v. Druckman,* 218 W.Va. 427, 624 S.E.2d 864, 868 (2005); syl. pt. 4, *Parkette, Inc. v. Micro Outdoors Advertising,* 217 W.Va. 151, 617 S.E.2d 501 (2005); syl. pt. 4, *Strahin v. Cleavenger,* 216 W.Va. 175, 603 S.E.2d 197 (2004). *See also,* 57A Am.Jur.2d *Negligence* § 78 (2004), stating that the determination of duty, in the context of alleged negligence, "is an issue of law for the court rather than for the jury."

#### 1.

### Sufficiency of Evidence

Pursuant to *W. Va.Code* § 18-5-13(6)(a) (1997), county school boards in West Virginia "have authority . . . to provide at public expense and according to such rules as the board may establish, adequate means of transportation for school children participating in board-approved curricular and extracurricular activities[.]"[5] Moreover, as stated in *W. Va.Code* § 18A–5–1(a) (2001):

---

**5.** This language was in effect at the timeof the accident. That provision is currently found in *W.*

*Va.Code* § 18–5–13(f)(*l*) (2003).

The teacher shall stand in the place of the parent(s), guardian(s) or custodian(s) in exercising authority over the school and shall have control of all pupils enrolled in the school from the time they reach the school until they have returned to their respective homes, except that where transportation of pupils is provided, the driver in charge of the school bus or other mode of transportation shall exercise such authority and control over the children while they are in transit to and from the school.

The phrase county school boards "have authority" in *W. Va.Code* § 18-5-13(6)(a) (1997), and the phrase "where transportation of pupils is provided" in *W. Va.Code* § 18A-5-1(a) (2001), establish that, although county school boards are authorized to provide transportation to events such as the Show Choir retreat herein, which had the aspects of both a curricular and an extracurricular activity, the Legislature has not mandated that school boards provide such transportation. *See, State ex rel Cooper v. Board of Education of Summers County*, 197 W.Va. 668, 671 n. 9, 478 S.E.2d 341, 344 n. 9 (1996), indicating that the provisions of *W. Va.Code* § 18-5-13(6)(a) (1996), are not mandatory.

Nevertheless, appellant Jackson contends that the Putnam County Board of Education exercised its authority under those statutes by adopting a Policy Manual, effective during the period in question, which required the Board to provide bus transportation to the September 2001 retreat. According to the appellant, the Policy Manual, rather than the General Admission Handbook, is the source of the duty and standard of care of the Board to provide transportation to the retreat The appellant asserts that the Board's failure to comply with the Policy Manual resulted in Timothy's death.

At the time of the September 2001 retreat, section T. 3.4. of the Board's Policy Manual required that student trips, whether for curricular or extracurricular purposes, have the approval of the school Principal and, if overnight or involving non-school days, have, in addition, the approval of the County Superintendent of Schools. Overnight trips also required the approval of the Board of Edu-

cation. Moreover, the Policy Manual provided that trips involving 10 or more students "must be made on school buses or charter buses" and that under no circumstances would a student or anyone under the age of twenty-one "be allowed to serve as a driver for a student trip." However, as more fully discussed below, the Policy Manual was never made a part of the record before the Circuit Court, and, during the course of this appeal, this Court has twice refused appellant Jackson's requests to include the Policy Manual in the record as a supplement.

In the proceedings below, the Board's Policy Manual was quoted, in part, in both the complaint and in the "stipulated facts proposed by plaintiff" portion of the joint pretrial memorandum filed with the Circuit Court The Board asserted, however, that the Manual speaks for itself, and both parties, in the pretrial memorandum, expressed an intent to offer the Policy Manual in evidence at trial. As stated above, attached to the Board's motion for summary judgment were the following: (1) a memorandum in support of summary judgment, (2) the General Admission Handbook of Policies and Procedures, (3) the depositions of Larry J. Jackson, Brian C. Ramsburg and Jeffrey A. Haught, (4) the Permission Statement and the Health and Insurance Information form and (5) two accident reports prepared by the police. A memorandum in opposition to the motion, without attachments, was filed by the appellant, and a reply was filed by the Board. The Policy Manual was not submitted; nor was it submitted during the argument of counsel upon the motion. Thus, the Policy Manual was never before the Circuit Court during its consideration and ruling upon the Board's motion for summary judgment and was never made a part of the record in this action.

It should be noted that in July 2004, prior to the motion for summary judgment, the Board filed a certificate of service with the Circuit Court stating that various documents requested in discovery had been served upon counsel for appellant Jackson. The documents served included the Policy Manual

which, according to the appellant, became part of the record before the Circuit Court by virtue of the certificate. The West Virginia Rules of Civil Procedure, however, suggest otherwise. Subsections (2) and (3) of Rule 5(d) concerning the filing of documents states in part:

> (2) Unless filing is required by the court on motion or upon its own initiative, depositions, interrogatories, requests for admissions, requests for production and entry, and answers and responses thereto shall not be filed. * * * Certificates of service of discovery materials shall be filed.

> (3) Unless otherwise stipulated or ordered, the party taking the deposition or obtaining any material through discovery is responsible for its custody, preservation, and delivery to the court if needed or ordered.

In that regard, prior to the filing of the July 2004 certificate of service, the Circuit Court entered a scheduling order, signed by counsel for the parties, which provided:

> As discovery materials are generally not filed with the Court but are retained by the parties, any motion or response thereto which references discovery materials shall include copies of such materials referenced, particularized to the pertinent part thereof A response by the non-moving party to a motion for summary judgment shall include specific references to the existence of facts which are claimed nonexistent by the moving party.

Upon appeal, appellant Jackson submitted portions of the Policy Manual to this Court. The Board's motion to strike that submission as not part of the record before the Circuit Court was granted. Subsequently, the appellant filed a motion to reconsider and, in addition, a request that this Court take judicial notice of the Policy Manual. By order entered on September 7, 2006, this Court denied both the motion and the request.[6]

■■ Rule 56 states that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions *on file*, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (emphasis added) As recognized in syllabus point 1 of *Guthrie v. Northwestern Mutual Life Insurance Co.*, 158 W.Va. 1, 208 S.E.2d 60 (1974), summary judgment cannot be defeated "on the basis of factual assertions contained in the brief of the party opposing a motion for such judgment." Rather, the parties have an obligation to "make sure that evidence relevant to a judicial determination be placed in the record before the lower court" so that this Court may properly consider it on appeal. *West Virginia Department of Health and Human Resources ex rel. Wright v. Doris S.*, 197 W.Va. 489, 494 n. 6, 475 S.E.2d 865, 870 n. 6 (1996). In *Powderidge Unit Owners Association v. Highland Properties*, 196 W.Va. 692, 474 S.E.2d 872 (1996), this Court stated that Rule 56 imposes no mandate upon a circuit court or this Court to "sift through the record in search of evidence to support a party's opposition to summary judgment." 196 W.Va. at 700, 474 S.E.2d at 880. Moreover, appellate review in summary judgment cases is limited to the record as it stood before the circuit court "at the time of its ruling." *Id.* This established principle of West Virginia jurisprudence is particularly relevant to the instant appeal.

■■ Summary judgment is mandated in our courts where, after appropriate discovery, there is no legitimate dispute regarding a genuine issue of material fact impacting liability apparent from the record before the

6. Although the request for judicial notice stated that a copy of the Policy Manual can be obtained from the Putnam County Board of Education's computer website or from the Board's office, it is not clear whether the current Manual is identical to the version in effect at the time of the September 2001 retreat. No motion to take judicial notice of the applicable Policy Manual was made before the Circuit Court. Nor has a complete copy of the Manual been provided to this Court.

This Court's order of September 7, 2006, stated that "all applicable portions of the Policy Manual are properly before the Court" That language is surplusage, however, inasmuch as that order expressly denied the motion to reconsider and the request for judicial notice of the Policy Manual. Moreover, as stated above, the previous order of this Court struck appellant Jackson's submission of portions of the Manual from consideration in this appeal.

circuit court. As Justice Frank D. Cleckley stated in *Williams v. Precision Coil,* 194 W.Va. 52, 459 S.E.2d 329 (1995):

> Rule 56 of the West Virginia Rules of Civil Procedure plays an important role in litigation in this State. It is designed to effect a prompt disposition of controversies on their merits without resort to a lengthy trial, if there essentially is no real dispute as to salient facts or if it only involves a question of law. Indeed, it is one of the few safeguards in existence that prevent frivolous lawsuits from being tried which have survived a motion to dismiss. Its principal purpose is to isolate and dispose of meritless litigation.

194 W.Va. at 58, 459 S.E.2d at 335 (internal quotations and citations omitted). Under West Virginia law, "[a] motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syl. pt. 3, *Aetna Cas. & Sur. Co. v. Federal Ins. Co. of New York, supra.* Pursuant to Rule 56(e):

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

In *Powderidge,* Justice Cleckley discussed the parties' burdens relative to motions for summary judgment. Therein he stated:

> Under our summary judgment standard, a party seeking summary judgment must make a preliminary showing that no genuine issue of material fact exists. This means the movant bears the initial responsibility of informing the circuit court of the basis of the motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. However, the movant does not need to negate the elements of claims on which the non-moving party would bear the burden at trial.
>
> The movant's burden is only [to] point to the absence of evidence supporting the nonmoving party's case. If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response. If the movant, however, does make this showing, the nonmovant must go beyond the pleadings and contradict the showing by pointing to specific facts demonstrating a "trialworthy" issue. To meet this burden, the nonmovant must identify specific facts in the record and articulate the precise manner in which that evidence supports its claims. As to material facts on which the nonmovant will bear the burden at trial, the nonmovant must come forward with evidence which will be sufficient to enable it to survive a motion for directed verdict at trial. If the nonmoving party fails to meet this burden, the motion for summary judgment *must* be granted.

*Powderidge,* 196 W.Va. at 698–9, 474 S.E.2d at 878–9 (internal quotations and citations omitted) (emphasis in original). Addressing the burden imposed by Rule 56 on a party opposing a summary judgment motion, we held in syllabus point 3 of *Williams* that:

> If the moving party makes a properly supported motion for summary judgment and can show by affirmative evidence that there is no genuine issue of a material fact, the burden of production shifts to the nonmoving party who must either (1) rehabilitate the evidence attacked by the moving party, (2) produce additional evidence showing the existence of a genuine issue for trial, or (3) submit an affidavit explaining why further discovery is necessary as provided in Rule 56(f) of the West Virginia Rules of Civil Procedure.

Syl. pt. 3, *Williams.*

■ Because the Policy Manual was not a part of the record before the Circuit Court and was not made a part of the record by the Appellant when opposing the summary judgment motion, the General Admission Hand-

book of Policies and Procedures, rather than the Policy Manual, is dispositive of whether a duty existed to provide transportation to the students attending the September 2001 retreat at the Rippling Waters Campgrounds. The Handbook exclusively concerned the Choir and contained a number of rules and guidelines for individual travel, as well as travel by bus, to Show Choir events. The Handbook, which was accepted by the parents, indicated that trips to Choir events were frequently by bus and that, if so planned, no individual travel arrangements were permitted, unless in extreme circumstances and under strict regulations. The Handbook allowed for individual travel which "usually" occurred: (1) in the case of day trips, (2) when the Choir was performing in the immediate area and (3) when the cost of renting a bus was prohibitive. Where individual travel to an event was utilized, the Handbook provided that liability was limited "to the period from the member's arrival at the event site until dismissal from the event. All other liability for the child's safety lies with the parent, or their designated drivers."

Consequently, in view of the above provisions of the Handbook, this Court finds no error in the determination of the Circuit Court that there was no duty on the part of the Putnam County Board of Education to provide transportation to the September 2001 retreat at Rippling Waters Campgrounds. In view of the record before the Circuit Court, no other conclusion is legally tenable.

### 2.

### Legal Duty and Proximate Cause

As eloquently explained by Chief Justice Davis, in her separate opinion concurring, in part, and dissenting, in part, in *Elliott v. Schoolcraft*, 213 W.Va. 69, 576 S.E.2d 796 (2002):

*A. No Action for Negligence Can Be Maintained in the Absence of a Legal Duty and the Question of the Existence of a Legal Duty is a Question of Law Appropriately Resolved in a Motion for Summary Judgment*

1. No action for negligence can be maintained in the absence of a legal duty. This Court has stated:

" 'In order to establish a *prima facie* case of negligence in West Virginia, it must be shown that the defendant has been guilty of some act or omission in violation of a duty owed to the plaintiff. No action for negligence will lie without a duty broken.' Syl. pt. 1, *Parsley v. General Motors Acceptance Corp.*, 167 W.Va. 866, 280 S.E.2d 703 (1981)." Syl. pt. 4, *Jack v. Fritts*, 193 W.Va. 494, 457 S.E.2d 431 (1995).

Syl. pt. 3, *Aikens v. Debow*, 208 W.Va. 486, 541 S.E.2d 576 (2000). *See also Hinkle v. Martin*, 163 W.Va. 482, 486, 256 S.E.2d 768, 770 (1979) ("It is axiomatic that to establish a prima facie case of negligence in West Virginia, it must be shown that the defendant has been guilty of some act or omission in violation of a duty owed to the plaintiff. No action for negligence will lie without a duty broken."). "Where the undisputed material facts do not establish the existence of a duty, summary judgment is appropriate." *Kazanoff v. United States*, 753 F.Supp. 1056, 1059 (E.D.N.Y.1990). *See also Gylten v. Swalboski*, 246 F.3d 1139, 1144–45 (8th Cir.2001) ("[W]e conclude that the grant of summary judgment was proper. Absent a duty, there can be no breach, and thus, no basis for recovery under a negligence theory."). *Cf. [Spaulding v.] Ads–Anker Data Systems–Midwest, Inc.*, 498 F.2d 517, 519 (4th Cir.1974) (applying West Virginia law) ("Had appellants' injuries allegedly resulted from defective brakes or tires, summary judgment would have been appropriate, for, absent special contract, an employer ordinarily has no duty to inspect and no power to control the maintenance of an employee's automobile."). Because "[s]ummary judgment is not a remedy to be exercised at the circuit court's option; [but] must be granted when there is no genuine disputed issue of a material fact[,]" *Powderidge Unit Owners Association v. Highland Properties, Ltd.*, 196 W.Va. 692, 698, 474 S.E.2d 872, 878 (1996), the circuit court's grant of summary judgment to the Board should be affirmed.

2. The question of the existence of a legal duty is a question of law. The existence of a legal duty is not a question of fact; it is an issue of law. As an issue of law, its resolution resides in the province of the court-not the jury.

> The determination of whether a defendant in a particular case owes a duty to the plaintiff is not a factual question for the jury; rather the determination of whether a plaintiff is owed a duty of care by a defendant must be rendered by the court as a matter of law.

Syl. pt. 5, *Aikens v. Debow*, 208 W.Va. 486, 541 S.E.2d 576. I believe that, even taking Mr. Elliott's factual averments in a light most favorable to him, he has failed to show a legal duty. *See, e.g., Gooch v. West Virginia Dep't of Pub. Safety*, 195 W.Va. 357, 366, 465 S.E.2d 628, 637 (1995) ("A central issue to the circuit court's determination is whether the record taken as a whole and in a light most favorable to the plaintiff is sufficient to create a genuine issue of material fact for trial.").

> Summary judgment is appropriate if, from the totality of the evidence presented, the record could not lead a rational trier of fact to find for the nonmoving party, such as where the nonmoving party has failed to make a sufficient showing on an essential element of the case that it has the burden to prove.

Syl. pt. 2, *Williams v. Precision Coil, Inc.*, 194 W.Va. 52, 459 S.E.2d 329 (1995).

*Elliott*, 213 W.Va. at 76–77, 576 S.E.2d at 803–04 (Davis, C.J., concurring, in part, and dissenting, in part).

In the action now before us, the circuit court concluded that, even if a duty to provide transportation existed, the Board's failure to provide transportation was not, as a matter of law, a proximate cause of Timothy's death. As this Court recognized in *Louk v. Isuzu Motors*, 198 W.Va. 250, 479 S.E.2d 911 (1996): "We are mindful of the principle that the breach of a duty owed, by itself, is not actionable, unless there is also sufficient evidence from which the jury may find by a preponderance of the evidence that

such negligence is a proximate cause of the injury." 198 W.Va. at 262, 479 S.E.2d at 923.

Here, both the flyer distributed by Director Haught concerning the retreat and the General Admission Handbook discouraged student driving without parental accompaniment. Moreover, prior to the September 28–30 weekend, Haught received a note from Timothy specifically stating that his father, Larry J. Jackson, would drive him to the Rippling Waters Campgrounds. Nevertheless, at some point, Mr. Jackson and Timothy decided, without notice to Haught or anyone associated with the retreat, that Timothy would ride with classmate Brian C. Ramsburg.

Syllabus point 3 of *Webb v. Sessler*, 135 W.Va. 341, 63 S.E.2d 65 (1950), holds: " 'Proximate cause' must be understood to be that cause which in actual sequence, unbroken by any independent cause, produced the wrong complained of, without which the wrong would not have occurred." Syl. pt. 4, *Spencer v. McClure*, 217 W.Va. 442, 618 S.E.2d 451 (2005); syl. pt. 4, *Stewart v. George, supra*. In this action, any duty of the Board under the Handbook to provide transportation to the retreat was removed from the September 30, 2001, accident by the change, without notice to school authorities, in Timothy's travel arrangements, despite, as the Circuit Court found, "full knowledge of the purported rules and regulations set forth by the Show Choir." Those circumstances, followed by Ramsburg's negligent operation of the vehicle, broke the chain of causation with regard to any breach of duty committed by the appellee Board. Consequently, the Circuit Court appropriately ruled in favor of the Board as a matter of law on this issue.

## V.

### Conclusion

Upon all of the above, this Court is of the opinion that the Circuit Court was correct in its determination that there was no duty on the part of the appellee, the Putnam County Board of Education, to provide transportation to the September 2001 retreat and that, even if such duty existed, the failure to provide transportation was not, as a matter of law, a proximate cause of Timothy J. Jackson's death. Accordingly, the order of the

Circuit Court of Putnam County, West Virginia, entered on June 29, 2005, is affirmed.

Affirmed

DAVIS, C.J., concurs and files opinion joined by MAYNARD, J.

STARCHER, J., dissents and files opinion joined by ALBRIGHT, J.

DAVIS, C.J., concurring:

(Filed June 29, 2007)

In this proceeding, the majority has affirmed the circuit court's order granting summary judgment to the Board. I agree with the decision and reasoning of the majority opinion. However, I have chosen to write separately in support of the majority's decision not to take judicial notice of the Board's Policy Manual.

1. As pointed out in the majority opinion, this Court denied the appellant's request to supplement the record to add the Policy Manual in this appeal *See Powderidge Unit Owners Ass'n v. Highland Props., Ltd.,* 196 W.Va. 692, 700, 474 S.E.2d 872, 880 (1996) ("[T]his Court for obvious reasons, will not consider evidence or arguments that were not presented to the circuit court for its consideration in ruling on [a] motion [for summary judgment]."). The dissenting opinion has quoted language from the order, denying appellant's request to supplement the record with the Policy Manual, which suggested that the Policy Manual was before this Court Obviously, as known by the dissent, that language was in error because this Court denied the motion to supplement the record.

2. The issue of judicial notice of adjudicative facts is addressed in Rule 201 of the West Virginia Rules of Evidence as follows:

(a) Scope of Rule. This rule governs only judicial notice of adjudicative facts.

(b) Kinds of Facts. A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

(c) When Discretionary. A court may take judicial notice, whether requested or not.

(d) When Mandatory. A court shall take judicial notice if requested by a party and supplied with the necessary information.

(e) Opportunity to Be Heard. A party is entitled upon timely request to an opportunity to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed.

## Appellate Judicial Notice was Discretionary

Here, the appellant argued that, under the Board's Policy Manual, the decedent was required to be transported by bus to the campground. Since this did not occur, the Board violated the Policy Manual and proximately caused the decedent's death. The Policy Manual was not presented to the trial court. Thus, the appellant asked this Court to take judicial notice of the Policy Manual.[1] The majority opinion correctly refused to take judicial notice of the Policy Manual.

The rules of this Court permit judicial notice to be taken of adjudicative facts[2] or law.[3] Regardless of whether judicial notice is requested for adjudicative facts or law, Professor Cleckley has pointed out that "[i]t is discretionary with appellate courts to permit judicial notice where the matter was not first brought before the trial judge." Frank-

In the absence of prior notification, me request may be made after judicial notice has been taken.

(f) Time of Taking Notice. Judicial notice may be taken at any stage of the proceeding.

(g) Instructing Jury. In a civil action or proceeding, the court shall instruct the jury to accept as conclusive any fact judicially noticed. In a criminal case, the court shall instruct the jury that it may, but is not required to, accept as conclusive any fact judicially noticed.

3. The issue of judicial notice of law is addressed in Rule 202 of the West Virginia Rules of Evidence as follows:

(a) When Mandatory. A court shall take judicial notice without request by a party of the common law, constitutions, and public statutes in force in every state, territory, and jurisdiction of the United States.

(b) When Discretionary. A court may take judicial notice without request by a party of (1) private acts and resolutions of the Congress of the United States and of the legislature of West Virginia and ordinances and regulations of governmental subdivisions or agencies of West Virginia and the United States; and (2) the laws of foreign countries.

(c) When Conditionally Mandatory. A court shall take judicial notice of each matter specified in paragraph (b) of this rule if a party requests it and (1) furnishes the court sufficient information to enable it properly to comply with the request and (2) has given each adverse party such notice as the court may require to enable the adverse party to prepare to meet the request.

lin D. Cleckley, Vol. 1, Handbook on Evidence for West Virginia Lawyers, § 2-1(E)(2) (4th ed. 2000).[4] Further, "it is inappropriate for appellate courts to take judicial notice of [local agency documents] that were not noticed in the trial court." *Id.*, at § 2-2(B). *See Vons Cos., Inc. v. Seabest Foods, Inc.*, 14 Cal.4th 434, 444 n. 3, 58 Cal.Rptr.2d 899, 905 n. 3, 926 P.2d 1085, 1091 n. 3 (1996) ("Reviewing courts generally do not take judicial notice of evidence not presented to the trial court.").

The issue of appellate court judicial notice of an agency's policy manual was addressed by the Court of Appeals of Oregon in *State v. Weems*, 190 Or.App. 341, 79 P.3d 884 (2003). *Weems* was a criminal case in which the defendant was convicted of possession of a controlled substance. The circumstances of defendant's arrest involved a minor traffic infraction.[5] During the investigation, the police learned that an outstanding arrest warrant had been issued for the defendant, and that the warrant was marked "caution." During the defendant's arrest on the warrant, the police patted him down for weapons. Although the patdown search did not reveal a weapon, the police searched the defendant's pockets and discovered a packet containing methamphetamine. When appealing the conviction, the defendant argued that the drugs found in his pockets should have been suppressed because the search was unlawful. The appellate court agreed with the defendant concluding that, once the patdown search did not reveal the presence of a weapon, the police should not have searched inside the defendant's pockets. The State argued that the search was lawful under a police policy manual because the outstanding warrant was marked "caution." Insofar as the policy manual was not presented to the trial court during the defendant's motion to suppress, the State asked the appellate court to take judicial notice of the manual. In revers-

ing the defendant's conviction because of the unlawful search, the appellate court rejected the State's judicial notice argument as follows:

In support of its argument that a search was justified, the state has requested that we take judicial notice of a section from the Law Enforcement Data System (LEDS) Operating Manual that defines under what circumstances a "caution" indicator will be assigned to a warrant. The LEDS document was not presented to the trial court. [The police officer] did not testify as to whether she was relying on the definition of "caution" given in the LEDS manual when she searched defendant. We deny the state's motion to take judicial notice of the LEDS document.

*Weems*, 190 Or.App. at 347, 79 P.3d at 887. *See also People v. Huntsman*, 152 Cal. App.3d 1073, 1086, 200 Cal.Rptr. 89, 97 (1984) ("[T]he Attorney General ... asked us to take judicial notice of the asserted fact that eight-by-eleven-inch plastic bags with 'Zip-Loc' tops are often used in narcotics transactions. We decline the request.... [I]n passing on the legality of a motion to suppress, it is the job of an appellate court to review evidence submitted on the motion in the trial court. No request for judicial notice was made there."); *State v. McCarthy*, 197 Conn. 247, 249 n. 2, 496 A.2d 513, 515 n. 2 (1985) ("The defendant ... urges this court to take judicial notice of results of the final 1980 census.... We decline to take judicial notice of facts that were not available ... at the time of trial. To hold otherwise would be to permit a party to appeal a case on a basis completely different from that presented below, essentially rendering the lower court decision superfluous."); *Hayes v. State*, 488 So.2d 77, 81 n. 3 (Fla.Dist.Ct.App.1986) ("[A]ppellee, State of Florida, filed a request for us to take ... judicial notice that ... the Punta Gorda Police Department had posses-

---

4. By statute it is mandatory for this Court to take judicial notice of local or private acts and resolutions of the Legislature that were relied upon by the trial court. *See* W. Va.Code § 57-1-2 (1923) (Repl.Vol.2005) ("[A]n appellate court shall take judicial notice of [local or private acts and resolutions of the Legislature] as appear to have been relied on in the court below."). *See also* Syl. pt. 4, *Groves v. County Court of Grant County*, 42

W.Va. 587, 26 S.E. 460 (1896) ("This court takes judicial notice of all such acts and resolutions of the legislature, though local and private, as appear to have been relied on in the court below.").

5. The defendant's truck was parked with its rear in the way of traffic.

sion of an F.B.I. report which showed that [defendant] had an arrest record in 1972. . . . We decline to take such judicial notice in rendering this decision since we must rely upon the record of the facts as they were revealed to the trial court."); *Brant v. Rosen,* No. 5–04–0516, 373 Ill.App.3d 720, 731, 311 Ill.Dec. 558, 568, 869 N.E.2d 232, 242 (2007) ("We decline to take judicial notice of these documents when they were never submitted to the trial court."); *Williams v. Williams,* 17 S.W.3d 559, 561 n. 4 (Mo.Ct.App.1999) ("[W]e agree with the dissent that we could take judicial notice of life expectancy and annuity tables . . ., but we decline to . . . because the record demonstrates that it was not raised before the trial court."); *State v. Gagnon,* 155 N.H. 418, 421–22, 924 A.2d 384, 388 (2007) ("[W]e decline to use the budget as a source to take judicial notice for the first time on appeal . . . because we decline to exercise our discretion on matters not presented to the trial court."); *Snyder v. Snyder,* No. 99–G–2230, 2000 WL 1876614, at *10 (Ohio Ct.App. Dec. 22, 2000) ("We decline to now take judicial notice of a fact which was not drawn to the attention of the trial court."); *Masters v. Rodgers Dev. Group,* 283 S.C. 251, 256, 321 S.E.2d 194, 197 (Ct.App. 1984) ("Appellate courts are generally reluctant to notice adjudicative facts Notice of 'facts' for the first time on appeal may deny the adverse party the opportunity to contest the matters noticed; it may also violate the general principle that appellate review should be limited to the record." (citations omitted)); *Stephens v. Dallas Area Rapid Transit,* 50 S.W.3d 621, 634 (Tex.App.2001) ("Appellee . . . has requested this Court to take judicial notice of . . . its personnel policy manual. Because these portions of the manual were not before the trial court, they would not properly be before us even if we took judicial notice of them. We decline to take judicial notice . . . of the . . . personnel policy manual."); *Finlayson v. Finlayson,* 874 P.2d 843, 847–48 (Utah Ct.App.1994) ("With very limited exceptions, judicial notice should not be used to get around the rule precluding raising issues for the first time on appeal. . . . We therefore decline to take

judicial notice, given there is no compelling countervailing principle to be served in taking such notice and given the trial court supported its conclusion with evidence not related to the [issue in question]").

It is clear from the above authorities that the majority opinion correctly declined to take judicial notice of the Board's Policy Manual. As one court noted, "an appellate court is naturally reluctant to take judicial notice of matters . . . promulgated by . . . agencies when the trial court was not requested to do so and was not given an opportunity to examine the necessary source material." *Sparkman v. Maxwell,* 519 S.W.2d 852, 855 (Tex.1975).

Based upon the foregoing, I respectfully concur. I am authorized to state that Justice MAYNARD joins me in this concurring opinion.

STARCHER, J., dissenting:

(Filed June 27, 2007)

I write separately to express my disagreement with the majority opinion in this case. The majority opinion simply ignores the *law* of the case in order to reach its result-oriented decision favoring the Putnam County Board of Education ("Board").

The majority decision rests on a single point, namely, the majority's refusal to recognize the existence of the Putnam County School Board regulations ("Policy Manual").[1] The majority steadfastly takes the position that "the Policy Manual was not 'before the Court.'" This refusal to acknowledge the Policy Manual is the only basis of the majority opinion, notwithstanding the fact that the Policy Manual was quoted in the complaint, the "stipulated facts proposed by the plaintiff," and the pretrial memorandum filed with the circuit court, was attached to the Petition for Appeal filed in this Court, and was discussed in the briefs and argument before this Court.

I would suggest that the Policy Manual— that is, the Board regulations relevant to this case—was before the Court. The Policy

---

1. This document is formally designated: "Policy Manual: Rules and Regulations of the Board of

Education of the County of Putnam" [May 20, 2002].

Manual was attached as an exhibit to the Petition for Appeal (approved by the Court on January 26, 2006), and by order of this Court on September 7, 2005, the last speaking by this Court in addressing pre-argument motions, this Court said that, "... the Court is of [the] opinion to and both hereby refuse said motions and further states that *all applicable portions of the policy manual are properly before the Court*." (Emphasis added.)

By refusing to recognize the Policy Manual regulations, the majority has turned back the pages of modern jurisprudence designed to secure a just determination of every action. For instance, Rule 1 of the *West Virginia Rules of Civil Procedure* states, in part, that the rules "shall be construed and administered to secure the just, speedy, and inexpensive determination of every action." Likewise, Rule 2 of the *West Virginia Rules of Appellate Procedure* says that the rules "shall be construed to allow the Supreme Court to do substantial justice." This Court has said that the primary purpose in adopting these rules "was to eliminate the intricacies and interminable delays inherent in the rules of common law pleading." *See Barker v. Traders Bank*, 152 W.Va. 774, 780, 166 S.E.2d 331, 335 (1969).

It is my view that in order to achieve a just determination of this action and to eliminate the intricacies inherent in the presentation of the instant case, this Court should have considered the Policy Manual as being properly before the Court, and, even if not "before the Court," then the Court should have officially taken judicial notice of the Policy Manual— which is clearly a set of regulations promulgated by a government agency. Instead, remarkably and without explanation, the majority ignored its own order and turned a blind eye to the obvious—the *law*.

And, even if one of these relevant Board regulations were not "in the record" or "before the Court," we still had an obligation to consider the regulations. This Court has had a long history of taking judicial notice of rules and regulations of administrative agencies. In *Foundation For Independent Living, Inc. v. The Cabell–Huntington Board of Health*, 214 W.Va. 818, 591 S.E.2d 744 (2003), this Court took judicial notice that a State Board of Health's rule was superceded by an emergency rule promulgated under the authority of *W.Va. Code*, 16–5D–17 [2003]. In *West Virginia Citizens Action Group, Inc. v. Daley*, 174 W.Va. 299, 324 S.E.2d 713 (1984) and in *McGraw v. Hansbarger*, 171 W.Va. 758, 301 S.E.2d 848 (1983), this Court took judicial notice of the regulations promulgated by the Board of Health that govern the licensing of community health centers. Interestingly in *McGraw*, unlike the instant case, the regulations which were judicially noticed were not even cited in briefs, nor were they mentioned in oral argument. In *McGraw*, this Court stated:

> This Court is at a loss understanding why the regulations promulgated by the Board of Health were not cited by counsel in their briefs nor mentioned during oral argument. But irrespective of this oversight on the part of counsel, the regulations, of which we have here taken judicial notice, have the force and effect of law .... (citation omitted)

*McGraw*, 171 W.Va. at 766, 301 S.E.2d at 857, fn. 3. In *State ex rel. Ash v. Randall*, 171 W.Va. 742, 301 S.E.2d 832 (1983), this Court took judicial notice of Public Water Supply Regulations promulgated by the West Virginia Department of Health.

This Court, and all appellate courts, I believe, look beyond the case file for relevant law in deciding cases on review. We look to constitutions, statutory law, and agency regulatory law outside the case briefs on a regular basis.

If this Court would have officially taken judicial notice of the Policy Manual—which the majority refused to consider—it would have been clear that the Board, by its own regulations, assumed the duty to provide bus transportation for the appellant to the show choir retreat at Rippling Waters Campground in Kanawha County.

*W.Va.Code*, 18–5–13(6)(a) [1997] [2] empowered local county school boards to establish

---

2. This code section was rewritten in 2003, and may now be found at *W.Va.Code*, 18–5–13(f)(1) [2003].

their own regulations regarding the transportation of school children to and from board-approved curricular and extracurricular activities. Specifically, *W.Va.Code*, 18–5–13(6)(a) provided:

> Each county board [of education], subject to the provisions of this chapter and the rules of the state board, has the authority: ... to provide at public expense, according to such rules as the board may establish, adequate means of transportation for school children participating in county board-approved curricular and extracurricular activities....

Furthermore, while the Legislature has given statutory authority to the State Board of Education to promulgate rules regarding the transportation of students participating in county board-approved curricular and extracurricular activities, I find no state regulation touching upon the issues presented in this case.[3] The State Board regulations relating to transportation of students appear to deal primarily with school bus transportation—vehicle maintenance, passenger regulations, discipline, operating procedures, and bus driver qualifications. The state regulations, however, do include a provision relating to curricular and extracurricular trips *when school buses are used*—but this section does not require that county boards of education use buses. *See* 126 CSR § 92.20 [2004]. This decision is left to the local boards of education.

The Putnam County School Board chose to adopt its own regulations relating to student trips. Specifically, the Board's regulation in the Policy Manual, Section T.3.4, defines student trips as follows:

> Student trips. Student trips include but are not limited to extracurricular trips, curricular trips and recreational trips. Extracurricular trips are those associated with extracurricular activities such as athletics, bands, clubs, and so forth. Curricular trips are those which supplement and extend classroom instruction. Such trips

must be closely tied to cognitive instructional learning outcomes and should provide students with experiences and opportunities that are an extension of topics being studied in the classroom.

Timothy Jackson's trip to Rippling Waters Campground was a curricular trip. The Show Choir classes met every day as part of the standard curriculum at Winfield High School. The Show Choir retreat to Rippling Waters was to supplement and extend classroom instruction, and was tied to the instructional learning that was being studied in the classroom. While the Show Choir course could be taken by students for credit or without receiving credit, Timothy Jackson took the course for credit. Furthermore, attendance at performances, at after-school rehearsals, and at the retreat at Rippling Waters Campground were mandatory for all students who participated in the Show Choir.

Section T.3.4 of the Policy Manual also addresses a requirement to provide bus transportation in prescribed circumstances:

> Trips involving ten (10) students or more *must* be made on school buses or charter buses. The principal may determine the mode of transportation for trips involving less than (10) students. (W.VA. CODE 18–5–13).

(Emphasis added.) The trip in question in this case involved the transportation of in excess of forty students, but, for some reason the Board, through Winfield High School, elected not to use buses—in contravention of this specific policy.

Significantly, the Putnam County Board of Education revised the Section T.3.4 regulation in May 2005, in apparent recognition of the instant case.[4] The revised Section T.3.4 reads as follows:

> It is *recommended* that trips involving ten (10) or more students be made on school or chartered buses. The principal may approve a teacher/sponsor/coach's request of transporting students to an event in automobiles providing that *only* the teach-

---

**3.** *See* Legislative Rule, Board of Education, West Virginia School Bus Transportation Policy and Procedures Manual (4336), 126 CSR § 92 [2004].

**4.** The complaint in the instant case was filed on September 26, 2003, and by order on June 29, 2005, the circuit court of Putnam County granted summary judgment in favor of the Putnam County Board of Education.

er/sponsor/coach and parents/guardians transporting their own children are permitted to drive. Cars must travel to an event in a caravan. With the approval of the teacher/sponsor/coach, a parent/guardian may sign out their child to ride home with them after an event. *Students shall not be permitted to drive.*

(Emphasis added.)

Section T.3.9. of the Board's 2002 version of its regulations—the regulations that were in place at the time of the incident that gave rise to this lawsuit—is further evidence of the Board's assumption of the duty to provide transportation under the circumstances of this case. Section T.3.9. of the regulations reads as follows:

Transportation in private vehicles. Students *shall not* be transported in private vehicles during the school day except in an emergency situation and then only with the approval of the principal.

On extracurricular trips, students *shall not be permitted to drive their own automobiles;* nor shall they be permitted to drive an automobile owned by another person, such as a Board employee, to transport themselves and others to an athletic event or any other extracurricular event.

(Emphasis added). Even though Section T.3.9. appears to relate primarily to extracurricular trips and emergency situations, the language clearly expresses a Putnam County Board of Education policy of not allowing students to drive themselves or other students to school activities.

In its defense, the Board argues, in part, that another "policy manual," the "Winfield High School General Admission, Handbook of Policies and Procedures" ("the Handbook") supercedes its own regulations and establishes the applicable policy regarding student drivers to the event that is relevant to this case. The Board's Policy Manual does permit a sponsor, coach, or director develop a handbook of rules and regulations for a variety of activities. *See* Policy Manual Section I.7.2. However, there is nothing in the language of this Section that authorizes a sponsor, coach or director to overrule the statutorily-authorized Board regulations generally governing the transportation of students. Therefore, I believe that any Handbook policy for a specific activity that contradicts the express language of Board regulations is void.

Finally, I recognize that some may suggest that reversing the circuit court in this case might have the effect of crippling both curricular and extracurricular activities in our public schools. I disagree. First, reversing the circuit court decision would only mean that the appellant would have the opportunity to present the case to a jury. It does not mean that a jury would find in favor of the appellant. Second, the enabling statute— *W.Va.Code,* 18–5–13 [1997]—allows a county board of education to establish a transportation policy; nothing in the enabling statute requires a local board of education to assume any specific duty with respect to the transportation of students to activities such as the one in the instant case. As previously noted, the defendant Board in this case amended its student transportation policy in 2006 to eliminate the mandatory language requiring bus transportation to events of more than ten students, reducing the same to a recommendation. At the same time the Board strengthened the prohibition against students driving themselves or other students to school activities.

Simply put, for the majority opinion to ignore the Putnam County Board of Education regulations that were operative at the time of the events that led to this case and that were acknowledged as being "properly before the Court" in this Court's September 7, 2005 order defies logic, common sense, and the *law.* For the reasons set forth in this dissent, I would reverse and remand this case, thereby permitting the appellant the opportunity to present the case to a jury.

I am authorized to state that Justice AL-BRIGHT joins in this dissent.